Filed 3/16/21  Estate of Witzling CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ESTATE OF MARIE ANTIONETTE WITZLING, Deceased | |
| SANDY WITZLING, | B303449 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BP160490) |
| v. | |
| RICHARD PONTI, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David J. Cowan, Judge.  Affirmed.

Mazur & Mazur, Janice R. Mazur for Appellant.

Sean K. Higgins for Plaintiff and Respondent.

This appeal arises from the settlement of a probate matter regarding the estate of Marie Antionette Witzling.[1]  Marie's husband, appellant Richard Ponti, and her son, respondent Sandy Witzling, asserted competing claims over the estate and a related trust.  Mid-trial, they reached a settlement agreement disposing of their claims and allocating 33 percent of the estate to Richard and the remainder to Sandy.  Shortly thereafter, Ponti moved to rescind the agreement.  The court denied the motion and granted Sandy's motion to enforce the settlement.  This appeal followed.  Ponti contends the trial court erred in rejecting his expert's opinion that he suffered from an acute stress reaction at the time of the settlement and was therefore incapable of understanding its terms.  Ponti further argues that the court lacked substantial evidence to conclude that he had the capacity to enter into a settlement agreement.  We affirm.

---

[1]We refer to individuals with the Witzling surname by first name for clarity.

## FACTUAL AND PROCEDURAL HISTORY[2]

### I. *Background*

Marie and Ponti both immigrated to the United States from Romania in the 1970s. According to Ponti, he first met Marie in the late 1970s, when she was married to John Witzling. In 1981, Marie and John established the John Isaac Witzling and Marie Antoinette Witzling Intervivos Revocable Trust Agreement (the Witzling Trust). John died in 1983. In December 2013, Marie married Ponti, who was 17 years her junior.

Marie had one child, Sandy, now an adult. In June 2014, Sandy filed for a conservatorship over Marie, alleging that her health was rapidly deteriorating. In August 2014, Sandy filed a petition to determine the validity of the Witzling Trust in Los Angeles Superior Court, case number BP154973 (the trust case). While these proceedings were pending, Marie died on February 26, 2015 at the age of 86. At the time, her estate consisted

---

[2]Sandy's brief includes a six-page section purportedly containing background facts, without any citations to the record. Ponti requests that we strike or disregard these unsupported portions of the respondent's brief. We will disregard all unsupported factual assertions in Sandy's brief and admonish his counsel to comply with the rules of court. (See Cal. Rules of Court, rule 8.204(a)(1)(C) [briefs must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"]; see also, e.g., *Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.* (2011) 194 Cal.App.4th 839, 846 ["We look askance at this practice of stating what purport to be facts—and not unimportant facts—without support in the record. This is a violation of the rules, . . .with the consequence that such assertions will, at a minimum, be disregarded."].)

primarily of two apartment buildings on Orange Street and Martel Avenue in Los Angeles, valued at over $3,000,000.

## II.   *Probate Litigation*

On March 3, 2015, Ponti filed a petition for probate of will and letters testamentary in Los Angeles Superior Court, case number BP160490 (the probate case).[3] The petition attached a copy of a handwritten will executed by Marie on March 3, 2014, purporting to leave her entire estate to Ponti.

Sandy filed a contest and objection to the probate in April 2015. He alleged that he was the sole beneficiary of the Witzling Trust, that Marie executed a "pour-over" will concurrently with the trust, and that half of the trust became irrevocable upon John's death in 1983. Sandy asserted that Marie's 2014 will was invalid because it was the result of undue influence by Ponti, who "secretly married" Marie in 2013, isolated her from family members, and prevented her from receiving proper medical care. As such, he contended that Marie lacked testamentary capacity at the time she executed the will. Sandy also alleged that the purported disposition of assets under the 2014 will was contrary to Marie's "long-standing estate plan to leave her property to her only child."

Sandy also filed a petition alleging financial and physical elder abuse of Marie by Ponti, and seeking an order declaring the marriage between Marie and Ponti a nullity. Sandy challenged a March 2014 deed executed by Marie, as successor trustee, transferring the Martel property out of the Witzling Trust,

---

[3]The probate and trust cases were deemed related and the court's 2019 statement of decision and judgment refers to both proceedings.

4

claiming that it resulted from Ponti's undue influence. He also challenged the validity of money transfers by Marie into a bank account jointly held with Ponti.

Sandy further alleged that Ponti "began to deny [Marie] proper food, water, clothing, bathing, and healthcare," refused to allow her to be hospitalized or properly medicated, and isolated her from family. Sandy claimed that he initiated conservatorship proceedings after Marie was hospitalized twice in June 2014 because she was malnourished, dehydrated, and "near death." Marie was discharged from the hospital into a residential care facility on July 1, 2014, where she ultimately died in February 2015.

Ponti filed a response and objections to Sandy's elder abuse petition. Ponti contended that he began dating Marie in 1989, at which point he moved in with her into an apartment building she owned on Orange Street. He further alleged that Sandy never visited Marie at her home and only saw her three or four times a year until 2013. Ponti asserted that the 2014 will and trust documents were done at Marie's suggestion and in accordance with her wishes. He disputed Sandy's allegations regarding his treatment of Marie and the state of her health prior to her "forced hospitalization" in June 2014. He attached declarations from two attorneys who stated that they met separately with Marie in March and April, 2014, that she confirmed her desire to leave her estate to Ponti, and told them that she wrote and signed the 2014 will.

III. *Settlement*

The court trial commenced on December 3, 2018 in the probate case. On the morning of December 11, 2018, the fifth day of trial, Ponti called as witnesses two longtime friends and

acquaintances, who testified in support of Ponti's claim that he and Marie held themselves out as husband and wife for decades, and that Marie remained in good health as of 2013.[4]

Sandy called his expert, psychologist Dr. Gary Freedman-Harvey, who opined that Marie had "signs and symptoms consistent with progressive dementia" beginning in mid-2013 or earlier, and that in 2014, Marie "lacked the executive function to make decisions of consequence for her health care or her finances, or contractually, or even personal relationship decisions." In particular, he testified that Marie lacked capacity to execute her March 2014 will, or make decisions regarding transfer of property or money. He opined that during 2014, Marie was "physically and emotionally dependent" upon Ponti and would not have been able to say "no" to him. He also noted several instances in the records where Ponti resisted "efforts to separate Mr. Ponti from Mrs. Witzling, for the purpose of some evaluation or intervention by a medical staff."[5]

Dr. Freedman-Harvey concluded his testimony in the afternoon on December 11, 2018. Afterward, during a discussion on the record regarding scheduling the remaining witnesses, Ponti's counsel, Marshal Oldman, stated to the court: "One of the

---

[4] Although Sandy had not yet concluded his case-in-chief, Ponti's witnesses were called out of order to accommodate scheduling issues.

[5] The record contains a transcript of the trial proceedings on December 11, 2018, but excludes the four prior days of testimony. We include some of the evidence from the underlying trial to the extent relevant to the initiation of settlement proceedings on December 11, 2018 and Ponti's claims regarding his mental state at the time.

matters that counsel and I have talked about, we did discuss settlement at some length with Judge Lager a couple of weeks before trial started and that the parties were not that far apart at that point, and it may be that at some point with this court's assistance we might be able to pull something together that people can agree to." Sandy's counsel agreed to speak to Sandy, and the court noted that it would only conduct a settlement conference "when I have assurance that both clients want me to do so." The court announced a 15 minute recess to allow the attorneys to speak to their clients, cautioning that "it is important for them to realize that I might hear things in a settlement conference that are kind of candid that might not be otherwise revealed during the trial."

After the break, the court placed on the record that the parties had conferred with their attorneys regarding "the court participating in a voluntary settlement conference at their request, that the parties understand and agree to all of the following: [¶] That they waive any right they might otherwise have . . . to disqualify the court from further hearing the trial . . . by virtue of its participation in a settlement conference with the parties. [¶] That this court will continue to be the trial judge for all purposes, if the case does not settle. [¶] That [the] parties understand that the court may be separately [*sic*] with the lawyers or with one lawyer or with one party in an attempt to resolve this dispute. . . . [¶] That the parties recognize and agree that they may express . . . candid comments about the chances of winning or otherwise . . . [that] they might not otherwise reveal to the court. . . . [¶] And that they agree and understand that the court can continue the trial . . . with that additional information. . . . [¶] That they are doing this willingly, voluntarily, with the

advice of their attorneys and in an effort to try to save time and expense." The court stated that it would be willing to conduct the settlement conference if "all of those conditions, provisions are agreeable." The court asked, "Mr. Ponti, do you agree?" Ponti responded, "Yes."

The proceedings were paused for the settlement conference. About 90 minutes later, the court announced on the record that the parties had reached an agreement. The court stated the terms for the record and directed the parties to "please add on as necessary: [¶] All the properties will be administered out of the estate proceeding, which is in front of the court now. Whether they were or are now in trust, everything comes back into the estate. The net proceeds – one-third of the estate, 33 percent, after all other expenses are paid – 33 percent will go to Mr. Ponti and 67 percent" would go to Sandy. Ponti's counsel reiterated that Ponti would take one-third of the estate and Sandy would take two-thirds. The court continued that "both properties will be sold promptly in the spring," by the estate administrator, and that "everybody shall cooperate in the prompt sale of the properties. The net proceeds will be administered through the estate." Both counsel agreed that the properties would be put on the market by May 1, subject to court confirmation, and that the court would retain jurisdiction to enforce the settlement. Both counsel further stated their agreement that the court could dismiss all pending petitions with prejudice under the terms of the settlement, and Ponti's counsel confirmed that Ponti would be "allowed to live in [the Orange property] until the close of escrow while he cooperates with the sale." The court then inquired who was paying the mortgage on the property, and Ponti responded that it was being paid by the administrator. The court and Ponti

8

then had the following exchange:

> "The court: Sir, have you heard all of those terms?
>
> ["Ponti]: Yes.
>
> "The court: Do you understand them?
>
> "[Ponti]: Yes, I do.
>
> "The court: Have you had enough time to speak to your attorney?
>
> "[Ponti]: Yes.
>
> "The court:  Do you agree to those terms?
>
> "[Ponti]:  Yes.
>
> "The court:  Counsel join?
>
> "Mr. Oldman:  Yes, your honor."

The court proceeded to ask Sandy and his counsel the same questions.  Afterward,  the court concluded the proceedings by thanking the parties "for being here and reaching this agreement. Congratulations and we are done."

## IV. *Post-Settlement Proceedings*

### A. *Petitions*

On February 5, 2019, Ponti, represented by new counsel, Randy Godin, filed a motion to repudiate the settlement agreement, vacate the dismissal, and stay the sale of the properties.  In the motion, Ponti stated that mid-trial, his former attorney "unilaterally offered to settle the case and then, pressured PONTI into a settlement."  He further stated that "[i]mmediately after" the settlement and dismissal of the cases, he "changed his mind" and notified Oldman "that he wanted to retract the settlement."  Ponti contended that he did not "understand the magnitude of what had just happened" and "was not thinking clearly," but under "severe pressure" from his attorney, he "reluctantly agreed to the terms in the open court."

9

In particular, he noted that he "always made it clear he did not want to move from the real property he had been living in for over 25 years," but that the terms of the settlement agreement included selling the two apartment buildings in Marie's estate, thus "forc[ing] PONTI to relocate." Ponti signed a verification under penalty of perjury declaring that he had read the motion and it was true and correct. Sandy filed an opposition.

On April 3, 2019, the court heard and denied Ponti's motion to repudiate the settlement. The court found that it could not procedurally set aside the settlement agreement by motion. Further, the court found that the "basis of the motion is unjustified, that a party cannot just reconsider an agreement they have already made." The court noted that the issue of Ponti leaving his home "was specifically discussed during the settlement conference. The court was aware that initially Mr. Ponti did not want to leave his home. Presumably, he and his then lawyers discussed the issue. Mr. Ponti then did agree to that provision, among others, on the record. I asked him about those. [¶] Therefore, this is not a case where he didn't realize he was agreeing to something that he was agreeing to. It was specifically discussed." The court also recalled that the trial had included "significant adverse testimony to Mr. Ponti, including elder abuse alleged by the other side," and it therefore understood why Ponti was "entering into the agreement at that time." The court noted that if Ponti had "some other basis for relief," he could raise it "in connection with any motion to enforce the agreement."

On April 9, 2019, Sandy filed a motion to enforce the settlement agreement pursuant to Code of Civil Procedure section 664.6. Ponti filed an opposition, represented by attorney

Donald Gordon.

In his opposition, Ponti argued that the agreement should be rescinded because "he was, at the time, not capable of consenting to the purported Agreement and lacked the necessary capacity" to understand or enter into it.  In his supporting declaration, Ponti stated that he had not discussed settlement between November 16, 2018, when the parties concluded an unsuccessful pre-trial mediation, and December 11, 2018.  Ponti was therefore confused when Oldman "blind sided" him on December 11, 2018 by telling Ponti "for the first time since the litigation started, that I *had* to settle."  He believed up to that point that "the case was proceeding well."  According to Ponti, Oldman then "whispered to me in the Court hallway for a mere few minutes . . . he could not explain, and I could not understand, why the sudden need to settle.  I initially refused to consider the settlement."  However, he was then taken into the court's chambers, which he found "very intimidating."  Ponti recalled hearing from the judge "that I should settle; I took this to mean that he had already formed opinions concerning the case."

Ponti claimed he did not understand the consequences of the settlement, including that "I would have to leave my home of 30 years and give up two thirds of what my wife wanted me to have."  He stated that he "became confused and [did] not remember much of what happened thereafter."  Ponti also stated that during the trial he had experienced "severe anxiety and sleeplessness," he was taking medication for a "head cold," and on December 11 he was "not feeling well" and had been unable to eat.  He claimed that he could not "recall actually agreeing to anything, nor do I recall my then attorney ever clearly explaining what was happening or why he suddenly had a change of mind."

11

In addition to his opposition to Sandy's motion to enforce the settlement, Ponti filed a petition for order to rescind the settlement agreement. Sandy filed objections to Ponti's petition for rescission.

## B.   *Evidentiary hearings*

The court held a two-day evidentiary hearing on Sandy's motion to enforce the settlement agreement and Ponti's petition to rescind it, on July 12 and August 22, 2019.

### 1.   *Dr. Wu*

Ponti presented expert testimony and a report from Dr. Pauline Wu, an adult geriatric psychiatrist and assistant clinical professor. In her report, Dr. Wu stated that she performed a "geriatric psychiatric examination" of Ponti for two hours on May 7, 2019 to determine his "general mental state and his capacity to contract during settlement proceedings on December 11, 2018." She opined that Ponti's "psychological reaction to the sudden shift of stopping trial proceedings and feeling compelled to settle in a short amount of time meets the diagnostic criteria for Acute Stress Reaction."

During the hearing, Dr. Wu explained that an Acute Stress Reaction (ASR) is defined under the International Classification of Disorders, 10th edition (ICD-10), as "a transient psychological response to an extreme mental stressor." She testified that typically, the reaction subsides within hours, and its severity depends on an individual's vulnerability, but the symptoms can include "a constriction, in terms of consciousness, narrowing of attention, an inability to comprehend stimuli, and disorientation," as well as partial or complete amnesia. In reaching this diagnosis, Dr. Wu testified that she primarily relied on her evaluation of Ponti on May 7, 2019, but also reviewed the

12

transcript of the settlement as well as the motions filed after the settlement.  She also based her opinion on her impression that trial was going well for Ponti up to that point, based on her review of the trial transcripts from that day.

Dr. Wu testified that Ponti was able to "describe a series of events in the trial before settlement, but during the settlement, he was unable to remember key details of the discussion.  He also didn't understand or appreciate the terms of the discussion, meaning he had false ideas, actually, that the settlement somehow was not binding, because it was oral.  He also had ideas that agreeing to the settlement somehow would not correspond to him having to move."  She also stated that Ponti "described an emotional reaction at the time that, to me, signaled that he perceived the abruptness of the settlement, like a trauma."

Dr. Wu acknowledged that all settlements are stressful.  However, she opined that Ponti's situation differed because earlier in the day, Ponti told her he was hopeful that the case seemed to be going well and he was about to start presenting his witnesses, but then "there was suddenly a shift in emotion at the time of the settlement . . . to a fearful and helpless emotion, and it wasn't something that he could control."  She noted that Ponti could recall some of what happened and could answer yes or no questions during the settlement, but "his ability to take in the series of events, to understand the details and the consequences, the alternatives to this agreement, those were all compromised because he was experiencing an acute stress reaction."  Dr. Wu reported that Ponti had a "distorted sense of time," and was confused about the order of events, and he also "transiently had an impaired ability to appreciate the quantities that were proposed in the settlement."  Ponti told her he remembered being

13

offered 25 percent in a prior settlement negotiation and that he ultimately got 33 percent, but could not calculate what the difference was, although he said "math was his strong suit." She also stated that there could be visible symptoms of an acute stress reaction, but they were not required for the diagnosis, nor was there any minimum time required.

During cross-examination, Dr. Wu agreed that an ASR could be caused by a life-threatening event, but testified that the typical context is "trauma, or a perceived trauma," and that the event did not have to be life-threatening. She explained that it was sufficient if the stress was perceived as severe. She related Ponti's statement that "I was dead, it's like you took out my brain and my blood. . . . My wife died again that day," concluding that Ponti perceived the event as "equivalent in severity" to a life-threatening event.

Dr. Wu acknowledged that she had never heard of an ASR being used to rescind a settlement agreement or contract. However, she stated that the difference with this settlement was that the "course of events during that trial, with the abruptness of the attorney bringing up the settlement proposal, was a shock to Mr. Ponti," coupled with Ponti's particular vulnerability. She could not give exact times when the acute stress reaction started or stopped. She opined that the amnesia started sometime "after the perceived trauma," which was when "the trial was supposed to continue, and suddenly, there was mention of a settlement." The stress reaction was due to the proposal of a settlement and its terms, which were different than what he and his attorney had previously planned.

In addition to the perceived trauma, Dr. Wu opined that Ponti was susceptible to undue influence based on the "apparent

14

authority in the relationship with his attorney." His emotional state and his physical state (not eating or sleeping well) contributed to his vulnerability. In addition, she testified that talking to the judge in chambers reinforced Ponti's fear and contributed to his vulnerability.

2. *Dr. Freedman-Harvey*

Sandy called an expert, Dr. Freedman-Harvey, as to Ponti's capacity. Dr. Freedman-Harvey opined that Ponti did not suffer from an ASR because, based on his review of Dr. Wu's report, "there was nothing that led to the requirement for a traumatic experience to precipitate the symptoms she described." He testified that he was familiar with the diagnosis of ASR as set forth in the ICD-10 and ICD-11. He explained that an accurate diagnosis of ASR required "an observed sensory trauma, and the trauma must be at a scale that is life threatening, or invokes danger." He testified that "all the research on the stress related disorders start with a perceived trauma that anyone. . .would respond to as a trauma," such as a mass shooting, fatal car accident, or a sexual assault.

Dr. Freedman-Harvey noted that he had been present in court earlier on the day of the settlement, and did not see a traumatic experience, nor did he see one described in Dr. Wu's report. He acknowledged that the situation was likely stressful for Ponti, but that "the quality of stress is very different from what the diagnostic manuals and the classification of conditions and disorders calls a trauma, and the trauma is . . . the basis for the acute stress reaction." Dr. Freedman-Harvey could not diagnose Ponti because he did not meet with him, but he did not believe "it was a proper application of acute stress reaction." In particular, he did not see any indication that Ponti experienced a

15

"fugue state" or a disconnection with reality. He explained that "the types of symptoms that Dr. Wu described, based on Mr. Ponti's interview with her, are stress reaction symptoms, but they aren't ones that rise to the level of incapacity."

Further, Dr. Freedman-Harvey explained that Ponti was able to provide enough detail about the settlement proceedings to show that "he was processing the issues regarding settlement, he was processing the people he was involved with. . . . He may have had moments of . . . being in a daze, and that happens when you get overwhelmed," but this was contrasted with an "all-blanked-out experience." He noted that Ponti was able to convey to Dr. Wu that he understood possible outcomes of trial and was able to weigh risks and benefits. He also noted that Ponti was able to recall details of the settlement discussions, including the 33 percent figure which indicated less of an issue with amnesia linked to any traumatic event. Dr. Freedman-Harvey further pointed out Ponti's statement that he went to his car immediately after the settlement and emailed his attorney about the settlement, which he found not consistent with someone experiencing ASR, but rather someone who is "in the here and now, they are processing their distress." He concluded that Ponti "was emotionally involved and cognitively involved in the settlement decisions, and the process of going through that is highly emotional, and that he may have had mixed feelings, he may have had buyer's remorse, he may have had some concerns about the process itself, but. . . I don't see how his ability to understand or appreciate what was going on was diminished, or that he was unaware that there were risks and benefits to many of the decisions and the options. . . . So in my view, he had capacity."

16

On cross-examination, Dr. Freedman-Harvey agreed with Dr. Wu that an ASR could be transitory and the symptoms could come and go. He also acknowledged that Ponti likely had an emotional response, especially to the possibility of having to move out of his home, but "that still is not an experience of a trauma that would then meet the level required for acute stress response." He rejected the suggestion that the ASR could cover a *perceived* (rather than actual) trauma, explaining that "the definition is very specific. There must be an experience, through the senses, of a danger. It could be a witnessed danger," such as witnessing someone else get killed, "but that's not a perception, it has to be through the senses, and just being involved in a discussion of the type of settlement process, or 'what am I going to be doing if I'm not living at this apartment,' which can be stressful, maybe even a crisis, but it's not a trauma." He noted that one could have thoughts that "my life is over" in many different stressful situations, but "that isn't the same thing as a traumatic experience that you are not witnessing a dangerous, near-death, life-threatening event that anyone would react [to] as a trauma." He also clarified that having an incomplete memory of events is not the same as an ASR.

Dr. Freedman-Harvey acknowledged that in his report, he had focused on acute stress *disorder*, which is part of the Diagnostic and Statistical Manual (DSM), rather than acute stress reaction under the ICD-10. He noted that the two diagnoses have some overlap but are not identical. He also testified that he does not use the ICD criteria in practice and has never treated or diagnosed someone with an ASR. But he had worked with people in traumatic stress situations and was familiar with the "range of symptoms that come up after a

17

trauma." In addition, he also testified that he reviewed the ICD criteria and was familiar with them.

### 3. *Oldman*

Oldman, Ponti's prior attorney, testified under subpoena. He declined to answer a number of questions on the basis of attorney-client privilege, including the genesis of his request for the settlement conference and the content of any conversations with Ponti. Oldman testified that at the time of the settlement, he had no reason to believe that Ponti did not understand what was happening or did not fully understand the terms of the settlement agreement. He represented Ponti starting in 2014 and stated that Ponti was an emotional client. Oldman testified that he had been practicing trust and estates law since 1976 and dealt with capacity issues every day.

### 4. *Ponti*

Ponti testified as to his mental state prior to and during the settlement proceedings. He stated that between the settlement conference in November 2018 and the settlement on December 11, he did not discuss settlement with anyone. He claimed that after he read the trial brief his attorney prepared, he "could hardly wait to get to the trial and present my case." He felt that he would be entitled to "100 percent [of the estate], or somewhere between 50 and 75 percent, at least." When the trial started, he was excited but also very emotional, due to the "drama" of the past few years and his feeling that he never had a "chance to mourn properly my wife" due to the ongoing litigation. Ponti testified that he had not been sleeping or eating well during the trial. Additionally, on December 10 and 11, he had a head cold and "was in very bad shape."

18

Ponti recalled that around 2:40 p.m. on December 11, his attorney stood up and asked the judge for a settlement conference. Ponti then recalled leaving the courtroom and telling his remaining witnesses for the day to go home. He did not recall anyone explaining to him the differences between a trial judge and a settlement judge. Next, Ponti testified that the two attorneys went into the judge's chambers. When Oldman came out, he whispered to Ponti in the hallway.[6] Then Ponti went into the judge's chambers. He testified that at that point, he was not in agreement with a settlement. He recalled that during the conference in chambers, the judge suggested "that I should take the settlement, because it's going to be expensive to continue for another two years, and so I was very confused." He contended that he was "very afraid" of the judge and felt helpless.

Following this conference, Ponti recalled that "[a]t the end, there was an on-the-record settlement discussion between the attorneys and the judge" with "a lot of legalese that I couldn't follow." Then, "in the last six seconds, I was asked 'Do you understand,' and I wanted to say 'no.'" He continued, "It was all very confusing to me, and I just always had a feeling that everybody is talking over me, and I'm not there, and I didn't have the strength to say no, and to stop everything. The next thing I know, I was across the street in the parking lot, sitting in my car for hours." After he sat in his car and tried "to remember what happened," he tried to contact his attorney around 6:00 p.m., but was not able to reach him. Ponti explained that he was trying to contact Oldman because he owed him hundreds of thousands of

---

[6] Ponti asserted attorney-client privilege and therefore did not testify to the content of any discussions with Oldman.

dollars and was not sure "who was going to pay the legal fees, and all that."

Ponti claimed that he did not recall agreeing to the settlement. At the time, he was "afraid out of my mind that I'm losing my home of 30 years . . . as well as the hundreds of thousands that was owing for these proceedings." When asked whether he "blanked out" during the proceedings, he said that he "had moments that I don't remember," but "didn't blackout entirely." He also testified that he was "blanked out" at the time he agreed to the settlement on the record and he did not know how he was able to agree to it. He also did not recall answering the judge's questions regarding whether he understood and agreed to the settlement. When asked during cross-examination why he was stressed about having to move out if he did not understand the settlement, he responded: "I don't know. I don't have a good answer for you." When asked about his statement to Dr. Wu that he did not think the settlement was binding, he stated: "It was more like it was my hope that I can come back to the trial, you know, because everything was against me that day. So I was hoping it's not binding." He clarified that the "blank out" happened right after the settlement issue was raised and then continued until after he got to his car. He also testified that when Oldman suggested the settlement, his first thought was that "my brilliant attorney find [*sic*] a way to win for me the case with only two witnesses."[7]

---

[7]Ponti also called two other witnesses who were present in the courtroom on December 11, 2018, to testify on his behalf. Both testified that when they saw Ponti on December 11, 2018, he looked tired and complained of feeling unwell.

Ponti acknowledged that he signed the verification on the February 2019 motion to repudiate the settlement agreement. When asked about the statement in the motion that he had changed his mind, he responded: "[t]hese are the words that an attorney could use, and I didn't realize they are not accurate. I didn't mean to change my mind. What I was telling [his attorney] was that I don't remember portion [*sic*] of what happened that afternoon."

## C.  *Statement of decision*

Following the hearing, Ponti submitted a closing trial brief and request for statement of decision. Sandy also submitted a closing trial brief.

The court issued a tentative statement of decision on September 18, 2019. Ponti filed objections and Sandy filed a brief response.

The court issued its final statement of decision on October 30, 2019.[8] The court summarized some of the evidence from the underlying trial, including testimony from a social worker employed by Adult Protective Services who stated that Ponti refused to allow her to evaluate Marie's health or to permit an ambulance to take Marie to the hospital. The social worker also testified to Marie's malnutrition and severe dehydration. The court noted Ponti's dispute of these facts, contention that "Sandy's motives related to his own financial interests," and presentation of evidence "whereby the Court questioned why Sandy, himself a physician, was absent from caring for his

---

[8]The court sustained in part and overruled in part Ponti's objections, but did not specify which objections it sustained. The parties have not raised any issue with these objections on appeal.

21

mother."

The court also described the events following Oldman's request for a settlement conference: "After both parties (i.e., including Ponti himself) and their counsel put their agreement on the record for the Court to then participate in a settlement conference, notwithstanding that this bench officer would...continue to decide the case if the case did not settle, the [Court] met with both parties and their counsel together and separately in chambers. [¶] The Court recalls there was some discussion in chambers with Ponti and Oldman about Ponti's wish to continue to live at the Orange Street property – where he has lived for some thirty years. The parties were able, however, to quickly reach an agreement that the parties and counsel then placed on the record." The court also found that it had "inquired of the parties if they had heard the terms, understood them, had enough time to confer with their counsel and if they agreed to the terms. . . . The parties, including Ponti, answered in the affirmative to each question."

The court found that Ponti had not established that he lacked the capacity to consent to the settlement agreement, setting forth seven bases for this conclusion. First, the court found that "as reflected on the record, Ponti agreed to holding a voluntary settlement conference before it started." The court noted that if Ponti did not agree or "was truly caught off guard," then the trial could have continued, and also noted Ponti's familiarity with the process given the prior settlement conferences in the case. The court rejected Ponti's claim that the court was "trying to force the parties to settle so it did not have to try the case," and pointed out that the court explained to Ponti "the risks involved in holding a settlement conference in front of

22

the same person who would be deciding the case."

Second, the court found that Ponti "understood what was transpiring during the settlement discussions." Specifically, the court recalled that Ponti raised a concern regarding his continued ownership and occupancy of the property, and that Ponti rejected Sandy's initial offer awarding 25 percent of the estate to Ponti, and then counter-offered 33 percent, which Sandy accepted.

Third, the court found that Ponti responded affirmatively to its questions regarding whether he heard, understood, and agreed to the terms of the settlement, and had sufficient time to confer with his attorney. The court "did not observe nor had any reason to believe that Ponti was experiencing any lack of capacity, duress, surprise, confusion, inability to speak or other reason why he was not then voluntarily entering into this agreement." The court further recalled that "Ponti also did not express any misgivings about entering into the agreement nor made any request for more time to consider whether to enter into the agreement." The court also rejected Ponti's claim that he was unduly influenced by Oldman, finding that relief from an agreement based on undue influence required a claim that Ponti was influenced by the other *party* to the agreement. Similarly, the court cited as its fourth reason Oldman's testimony that he had no reason to believe Ponti did not appreciate what was happening or understand the terms of the agreement when he agreed to them. The court found that Oldman "was in the best position of any person (other than Ponti) to state what his client was then experiencing," and noted that Ponti was "able to shield" Oldman's potentially rebutting testimony about what transpired by refusing to waive the attorney-client privilege.

23

Fifth, the court gave little weight to Dr. Wu's "speculative" testimony that Ponti was experiencing an ASR at the time the agreement was reached. The court noted that Dr. Wu had "no personal knowledge what . . . if anything, Ponti was experiencing." The court also rejected the bases Dr. Wu gave for her opinion. In particular, the court found that Dr. Wu "had little to no understanding of what in fact occurred during the settlement discussions and appeared to primarily just take Ponti at his word (five months after the incident in question)." The court also stated that Dr. Wu "acknowledged that ASR usually occurs where a person has just experienced a life-threatening danger or trauma . . . even if it might occur without these sorts of events," and that no comparable event was present. The court further stated it did not doubt that Ponti was under stress during trial and was sleeping and eating less than usual, "which may have added to his difficulties," but found "Wu's opinion that this scenario makes a litigant unable to enter into an agreement lacking in common sense," given that the court "heard nothing about what Ponti was going through that was much different from what many litigants likely also go through handling difficult cases." The court reasoned that to suggest such circumstances could trigger ASR and claims of incapacitation would be "to sanction chaos." Further, the court found that the agreement was simple and therefore "the level of contractual capacity needed was low." As such, the court did not find reasonable the suggestion that Ponti did not understand the financial consequences of the settlement, particularly where Ponti told Dr. Wu that math was his strong suit. Additionally, the court found that Dr. Wu "was not able to identify what deficit in mental functioning Ponti suffered, as required by Probate Code sec.

24

810(c) by way of stating what exactly Ponti was unable to do, as required by Probate Code sec. 811."

Sixth, the court cited Dr. Freedman-Harvey's testimony that ASR requires a triggering traumatic experience. The court also relied on Dr. Freedman-Harvey's opinion that "settlement discussions in a courthouse would not be considered stressful to the level contemplated by the medical literature."

Seventh, the court found Ponti's claim that he lacked capacity was not credible. The court cited Ponti's admission in his initial motion that he "had simply changed his mind about having entered into the agreement." In addition, the court stated it understood Ponti's testimony to be that "he in fact did not lose capacity until *after* reaching the agreement – when he purportedly blanked out for a few hours while sitting in his car." The court rejected the claim that Ponti lost capacity during the settlement proceeding. The court cited Dr. Wu's acknowledgment that Ponti "did recall the events leading up to and including the settlement – including the possibility that was conveyed that he might lose everything." As such, the court "does not understand how [Ponti] can contend he did not understand what was happening." Given the progression of the trial and Sandy's evidence, the court rejected Ponti's suggestion that he did not appreciate that there was "at least some risk" that he would not win or that "Ponti could still have thought on the fifth day of trial the underlying events were not in dispute and there was not some possibility the court might accept" Sandy's version of the evidence. In sum, the court found that Ponti had not established that he lacked "the ability to understand and appreciate the factors related to decision making set out in Probate Code sec. 812."

25

The court also concluded that there was no "fundamental unfairness" to the settlement agreement that would justify rescission on equitable grounds.[9] The court accordingly denied Ponti's petition for rescission with prejudice and granted Sandy's motion to enforce the settlement agreement. The court entered judgment on November 18, 2019. Ponti timely appealed.

## DISCUSSION

Ponti contends the trial court erred in granting Sandy's motion to enforce the settlement agreement and denying his corresponding motion for rescission. His appeal is limited to challenging the trial court's determination that he had capacity to enter into the agreement. He does not otherwise dispute that the agreement met the requirements under Code of Civil Procedure section 664.6.[10] We conclude that substantial evidence supports the trial court's determination and therefore affirm.

I.   *Legal Standards*

A.   *Mental Capacity Standard*

Probate Code sections 810 to 812[11] set forth the mental capacity standard for performing certain legal acts and decisions,

---

[9]This finding is not challenged on appeal.

[10]Code of Civil Procedure section 664.6, subdivision (a) provides, in pertinent part: "If parties to pending litigation stipulate . . . orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."

[11]All further statutory references are to the Probate Code unless otherwise indicated.

26

including "contracting, conveying, marrying, making medical decisions, executing wills or trusts, and performing other actions." (§ 810, subd. (b).) Section 810, subdivision (a) establishes a rebuttable presumption "that all persons have the capacity to make decisions and to be responsible for their acts or decisions." Section 811, subdivision (a), provides that a person lacks capacity when there is a deficit in at least one of the listed mental functions and "a correlation [exists] between the deficit or deficits and the decision or acts in question." The statute includes four categories of mental functions: (1) alertness and attention (§ 811, subd. (a)(1)); (2) information processing (§ 811, subd. (a)(2)); (3) thought processes (§ 811, subd. (a)(3)); and (4) ability to modulate mood and affect (§ 811, subd. (a)(4)). A deficit in one of the listed mental functions "may be considered only if the deficit, by itself or in combination with one or more other mental function deficits, significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." (§ 811, subd. (b).)

Section 812 provides: "Except where otherwise provided by law, . . . a person lacks the capacity to make a decision unless the person has the ability to communicate verbally, or by any other means, the decision, and to understand and appreciate, to the extent relevant all of the following: [¶] (a) The rights, duties, and responsibilities created by, or affected by the decision[;] [¶] (b) The probable consequences for the decisionmaker and, where appropriate, the persons affected by the decision[; and] [¶] (c) The significant risks, benefits, and reasonable alternatives involved in the decision."

27

Thus, under these sections, a deficit in mental function is relevant only to the extent "it significantly impairs the person's ability to appreciate the consequences of his or her actions *with regard to the type or act or decision in question*." (*Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 730.) As such, "[m]ore complicated decisions and transactions thus would appear to require greater mental function; less complicated decisions and transactions would appear to require less mental function." (*Ibid.*; see also *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1352.)

**B.    *Standard of Review***

In general, a trial court's "'factual findings on a motion to enforce a settlement pursuant to [Code of Civil Procedure] section 664.6 "are subject to limited appellate review and will not be disturbed if supported by substantial evidence."'" (*J.B.B. Investment Partners, Ltd. v. Fair* (2014) 232 Cal.App.4th 974, 984, quoting *Osumi v. Sutton* (2007) 151 Cal.App.4th 1355, 1360.) "Consistent with the venerable substantial evidence standard of review, and with our policy favoring settlements, we resolve all evidentiary conflicts and draw all reasonable inferences to support the trial court's finding that these parties entered into an enforceable settlement agreement and its order enforcing that agreement." (*Osumi v. Sutton, supra,* 151 Cal.App.4th at p. 1360.) "'We may not reweigh the evidence and are bound by the trial court's credibility determinations. Moreover, findings of fact are liberally construed to support the judgment.'" (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94, quoting *Estate of Young* (2008) 160 Cal.App.4th 62, 75–76.)

However, in this challenge, Ponti had the burden of proof to establish that he lacked capacity presumed under section 810 (see *Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1040 [finding

28

party's burden to prove incapacity because capacity is presumed under section 810]), and the trial court found he did not meet that burden. In such a circumstance, the question for review is not whether substantial evidence supported the trial court's finding. Rather, "'where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. . . . [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."''' (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838, quoting *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled in part on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; accord *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465; *Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769.) We apply this standard to Ponti's challenge.[12]

## II. *Analysis*

We cannot conclude that the evidence compels a finding in

___

[12]We note that even under a substantial evidence standard, we would conclude that substantial evidence supports the trial court's determination of capacity.

29

favor of Ponti as a matter of law. The trial court made detailed findings in support of its conclusion that Ponti had the ability to appreciate the consequences of the settlement agreement at the time he made it. In particular, the court disbelieved Ponti's claim that he did not understand or recall the settlement proceedings. In support of this finding, the court pointed to Ponti's own initial statement in his motion to repudiate the settlement, in which he stated under oath that immediately after the settlement he "changed his mind" and wanted to retract the agreement. Although Ponti later testified that he did not understand the meaning of this statement, the court was not required to accept that explanation.

In addition, the court relied on Ponti's own statements to Dr. Wu and testimony during the evidentiary hearing as evidence of his capacity. Ponti claimed he was unable to recall most of the settlement conference, including agreeing to the terms on the record. But he also provided his recollection of many details of the proceedings, starting with his immediate thought after Oldman suggested settlement that they must have won, through the meetings in chambers with the attorneys, his conference with Oldman and determination not to settle, and the subsequent meeting with the judge, including his recollection that when the court asked him to confirm his understanding and agreement, he wanted to say "no" but did not have the strength. Ponti testified that *after* the agreement was on the record, he then "blanked out" and could not recall how he got out to his car. Ponti also contended that at the time he could not understand the terms of the settlement or calculate the percentages at issue. But the court cited evidence that Ponti discussed rejecting an offer of 25 percent and making a counteroffer of 33 percent, as well as his

30

concern that he might have to move out of his home if the properties were sold and his fear that he might lose everything. This evidence supports the trial court's finding that Ponti had capacity to assess the risks and alternatives involved, particularly given the simplicity of the settlement terms.

Moreover, the evidence was undisputed that Ponti displayed no signs of confusion or distress during the settlement conference. The trial court and Oldman—both experienced in handling probate and capacity matters—recalled as much (see *Richardson v. Richardson* (1986) 180 Cal.App.3d 91, 97 [substantial evidence of agreement included court's own recollection of settlement proceedings]), and their recollections were supported by the record. Ponti did not raise any issues or questions during the settlement conference, but instead provided information to the court and answered affirmatively that he understood and agreed to the terms of the settlement. As such, the weight of the evidence did not require the conclusion that Ponti "blanked out" and lost capacity during the settlement proceedings.

Ponti relies heavily on Dr. Wu's findings as the "most significant" factor in the court's decision, and contends the court erred in rejecting her opinion. As we have discussed, the trial court's conclusion was supported by evidence apart from the expert testimony presented. Moreover, Dr. Wu's opinion that Ponti suffered from an ASR was neither unassailable nor undisputed. Significantly, Dr. Wu relied primarily on Ponti's own recitation of his mental state during the settlement proceedings as the factual basis for her conclusion that he lacked capacity. Thus, the court's finding that Ponti's testimony lacked credibility undermines the opinions by Dr. Wu based upon that

31

testimony.

Ponti also contends that Dr. Wu's diagnosis of ASR was undisputed because Dr. Freedman-Harvey was "unqualified" to offer an opinion. But Dr. Freedman-Harvey was offered as an expert on capacity during the hearing without objection. Further, although he did not use the ICD-10 in practice, he testified to his familiarity with ASR and explained in detail the causes and symptoms. Both experts agreed that ASR *could* be caused by a life-threatening incident, but they disagreed as to the degree of severity of the trauma *required* to trigger the reaction. Notably, however, Dr. Wu acknowledged that she was unaware of any instances of ASR being applied to rescind a contract or settlement agreement. The court was entitled to weigh these competing opinions and determine which it found credible.[13]

In essence, Ponti is urging us to substitute our judgment for that of the trial court by giving more weight to Dr. Wu's opinion. We decline to do so. "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53; see also *Conservatorship of O.B., supra*, 9 Cal.5th at p. 1008 ["an

---

[13]We also agree with the trial court in rejecting Ponti's claim of undue influence by Oldman. Ponti's citation to *Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 131 is inapposite, as that case involved a claim for rescission of a contract based on undue influence of the other contracting party. There is no such claim against Sandy here.

32

appellate court . . . must accept the fact finder's resolution of conflicting evidence; and it may not insert its own views regarding the credibility of witnesses in place of the assessments conveyed by the judgment"].)

## DISPOSITION

The judgment is affirmed. Respondent Sandy Witzling is entitled to recover his costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


COLLINS, J.


We concur:


MANELLA, P. J.


CURREY, J.